

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00028-CV

IN THE INTEREST OF E.S.D.L.S.,
A.A.D.L.S., P.H.D.L.S., S.D.L.S.,
AND Y.S., CHILDREN

----------

## FROM 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal.[2]  In a single issue, Appellant Mother

argues that the evidence is legally and factually insufficient to support the trial

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal was filed).  We note that under that rule, our opinion is required to issue on or before July 17, 2013.

court's finding that termination of her parental rights is in the best interest of her five children—E.S.D.L.S., A.A.D.L.S., P.H.D.L.S., S.D.L.S., and Y.S. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

Mother testified[3] at the termination trial that she had never been married, that she had been pregnant almost every other year for twenty years, that she had given birth to eleven children, that she could not recall each of their birthdates, and that she did not have custody of any of her eleven children at the time of the termination trial.[4] The children at issue in this appeal include E.S.D.L.S., a female born on November 28, 1999; A.A.D.L.S., a male child born on April 13, 2006; P.H.D.L.S., a male child born on February 29, 2008; S.D.L.S., a female child born on March 5, 2010; and Y.S., a female child born on January 18, 2012. Because Mother challenges the sufficiency of the evidence to support the jury's best-interest finding, we set forth the evidence presented at trial that will be used in the *Holley* analysis below.

---

[3]Mother, who speaks only Spanish, utilized an interpreter to testify at the termination trial.

[4]Two of Mother's children, M.D.L.S. and R.S.L.S. who are not involved in this appeal, were living with their grandmother in Mexico because when their father went to jail, Mother struggled to provide food "and everything else"; the grandmother offered to help, the children went to stay with her, and then the grandmother refused to return the children.

2

## B. Mother's Housing and Employment History

At the termination trial, Mother detailed her housing history, stating that she had moved many times in the four years prior to the termination trial because she was struggling financially and was kicked out by her landlord. Mother said that she was able to pay rent and provide for her five children prior to their removal by the Department of Family and Protective Services ("the Department") because the father of Y.S. provided for them and because Mother received food stamps. Mother had lived at her current address on 24th Street for two months prior to the termination trial.

The home in which Mother was living at the time of the termination trial contained two bedrooms: J., the father of Mother's older boys who are not involved in this appeal, slept in one bedroom with two of the boys; the third boy slept on the couch; and Mother slept in the other bedroom. Mother was supposed to pay rent to J., but she had not paid him any rent as of the time of the termination trial. She understood that J. could kick her out at any time and testified that she was making an effort to get an apartment.

At the time of the termination trial in November 2012, Mother had $30; she did not have a bank account and did not have any money saved. The last time that Mother had a regular paying job was in June 2012 when she cleaned offices. During the six months that she worked cleaning offices, she was paid every two weeks and received approximately $200 to $280. She testified that she was cleaning one or two houses and offices at the time of the termination trial.

3

## C. First Removal When S.D.L.S. Was Born with Cocaine in Her System

A Family Based Safety Services (FBSS) case was opened in March 2010, and the Department removed the children because Mother and S.D.L.S. tested positive for cocaine when S.D.L.S. was born.

## D. Domestic Violence

Mother attended counseling in November 2010 and reported to her counselor that her partner had been verbally and mentally abusive to her and her children throughout the relationship. The counselor's notes, which were admitted into evidence at the termination trial, state that the "husband" abuses "when they eat the food" and that he had recently threatened to hit Mother with a belt and had taken his belt off as if to hit her. The counselor's notes state that Mother's children had asked her to leave him and move them to a new home because they did not want to continue living in the home with him. Mother told the counselor that she takes her children out of the home when her partner is mad.

Mr. D.L.S., the father of several of the children involved in this appeal and presumably the "partner" Mother had mentioned during counseling, was arrested in November 2010 for sexually abusing Mother. Mother recalled telling the Victims' Assistance office that she did not want Mr. D.L.S. to go to jail because he would not be able to help her with the children and that was the only assistance that she had at that time. Despite that Mr. D.L.S. had sexually assaulted Mother, she wanted him free to support her because she was "struggling a lot being all by [her]self" and because, in Mother's opinion, he is a

4

good father to the children. Mother's understanding was that "he could be put to work" to support her. Mother believed that her problems started when Mr. D.L.S. mistreated her, not when S.D.L.S. tested positive for cocaine.

### E. Children Are Returned to Mother

Mother ultimately completed her FBSS services, and the children were returned to her.

### F. Second Removal When Y.S. Was Born with Cocaine in Her System

Elizabeth Cuevas, the Department caseworker for Mother, testified that Mother's children came into care in January 2012 because Mother and Y.S. tested positive for cocaine at Y.S.'s birth and because Mother admitted to using cocaine while caring for the children. The Department attempted to place the children with Mother's roommate and Mother's mother, who were living in the home that the children had been removed from. Mother was not allowed to come back to the home, but she came back and locked her mother out so that she could not care for the children. Mother's roommate and Mother's mother were unable to protect the children from Mother.[5] The Department was thus forced to remove the children from the home.

After the Department removed the children, they drug tested all of the children, and S.D.L.S. tested positive for methamphetamine at twenty-two

---

[5]Mother's mother told Cuevas that she was fearful of Mother and did not feel like she could be protective of the children. The "Child's Service Plan" noted that "Maternal grandmother fears [M]other and has to sneak out [of] the house with the children in order to bathe them and provide them with food."

months old.[6] Mother told Cuevas that she did not know how S.D.L.S. had tested positive for methamphetamine. Mother testified at trial, however, that she had left S.D.L.S. with her mother and sister and that "they do have pills over there prescribed by the doctor."

Cuevas testified that when the children came into the Department's care, they were "obviously neglected. They had infestations of lice that were very difficult to remove." Cuevas said that one of the children was so delayed that the Department thought he could not speak either Spanish or English, but after working with the speech therapist, he was able to communicate. Cuevas testified that the children had "come a long way" since the removal. At the time of the termination trial, all five children had been placed together in a dual-licensed, adoption-motivated placement.

Cuevas testified that Mother's oldest child, E.S.D.L.S., had made statements indicating that she had been abused or neglected. E.S.D.L.S. had stated that she had been withheld from school to take care of the children while Mother was not present, that Mother could be mean and violent towards the children, that all of the children had been locked in the closet as a form of punishment,[7] and that she wanted Mother to get help and to be nice to them.

_____

[6]The notes from Cook Children's Hospital, where S.D.L.S. was taken for the drug test, reveal that she presented with bruises on her chest, chin, and right abdomen.

[7]The "Family Service Plan" dated February 28, 2012 states, "All children fear retribution as they have been locked in closets and denied food for not doing

6

E.S.D.L.S. knew that Mother used drugs and said that Mother needed help. E.S.D.L.S. had inquired of Cuevas whether Mother was still using drugs and whether she was completing her classes to enable her to have the children returned.

### G. Mother's History of Drug Use

Mother started using cocaine after E.S.D.L.S was born in 1999.[8]  Mother used cocaine approximately four times while she was pregnant with S.D.L.S. Mother attended drug classes after she gave birth to S.D.L.S., but she used drugs again after taking the classes.

Mother testified at the termination trial that she had previously used cocaine but that she was no longer a drug user.  Mother last used cocaine in January 2012 on the day before she gave birth to Y.S.  Mother testified that she has never lived in a drug house or in a house where other people used drugs.

Mother testified that it was hard for her to discuss her cocaine use because she did not like "[t]o tell what [she] was doing."  Mother said, "I wasn't an addict or anything, but once in a while."  Mother testified that she was able to parent her children while she was using cocaine because, "like I told you, I was not using as much and I wasn't an addict and I was always keeping an eye on my children."

what their mother wants."  The Court-Appointed Special Advocate's report noted that S.D.L.S.'s only word was "cucui," which E.S.D.L.S. explained to her foster mother was a monster that Mother had said would "get" S.D.L.S. if she made noise in the closet.

[8]Mother testified that she had never used marijuana or methamphetamine.

Mother was not initially aware that she had put her children in danger when she had used cocaine; according to notes from her counseling, Mother displayed a lack of insight into the role that substance abuse has played in her life and believed that she could stop using at any time. But at the time of the termination trial, Mother could see the damage of how she had hurt her children, was "very remorseful," and regretted using cocaine. Mother explained that she had hurt her children by using drugs, which had resulted in their being removed from Mother and in their missing the love and affection that she provides. Mother testified that she had changed a lot; at the time of the termination trial, she was thinking more about her children and behaving better with them so that the Department would return them to her.

## H. Mother's Service Plan and Her Compliance

Mother's service plan in the present case required her to obtain an appropriate living environment for the children and to provide Cuevas with a copy of the leasing agreement; Mother, however, had not obtained an appropriate living environment for the children or provided Cuevas with a leasing agreement. Cuevas testified that throughout the case, Mother had never provided an address to enable Cuevas to make a home visit.[9]

---

[9]Nor had Mother provided Cuevas with information related to the location of her children's fathers.

Mother's service plan required her to obtain legal employment and to provide Cuevas with monthly pay stubs; Mother had not provided documentation to show that she was employed at the time of the termination trial.

Mother's service plan required her to attend Alcoholics Anonymous and Narcotics Anonymous meetings and to provide Cuevas with copies of the monthly sign-in sheets; Mother had not attended any meetings. Mother's service plan required her to locate a sponsor and to provide Cuevas with the sponsor's name and phone number; Mother had not done this.

Mother's service plan required her to participate in individual counseling with Opportunities Counseling Center; Cuevas testified that Mother had completed this task at the time of the termination trial.[10] Contrary to Mother's testimony that the counselor at Opportunities Counseling Center had made a recommendation that the children be returned to Mother, the counselor, according to Cuevas, had recommended the opposite.

Mother's service plan required her to attend and to participate in Safe Haven's eight-week program for domestic violence; Mother had not completed this task.

Mother's service plan required her to refrain from criminal activity and illegal acts; Cuevas was not aware of any criminal activity that Mother had engaged in.

---

[10]Mother, however, testified that she had not participated in individual counseling during this case.

Mother's service plan required her to attend all scheduled visitations with her children;[11] Mother had missed three or four visits and had arrived late to some visits. Mother had not given reasonable explanations for arriving late to the visits, and the Department had canceled some visits because Mother had arrived more than twenty minutes late. The children had already been transported forty-five to fifty minutes to attend the visits and then had to return without seeing Mother. The children did not like when Mother missed a visit; "[i]t would upset them, especially [E.D.L.S.], the oldest child."

Mother's service plan required her to attend Resource Recovery for a drug assessment and drug treatment; Mother completed the drug assessment, which recommended that she attend outpatient services for six months. Mother completed half of her outpatient classes. Mother provided three oral swab drug tests during the case, which were negative, but she failed to appear for two requested hair follicle tests.

Cuevas requested that Mother participate in the Safe Haven CPS classes. Mother testified that she had attended one class at Safe Haven on the Friday before the termination trial.

### I. Mother's Plan for the Children

Mother testified that she is ready to keep her five children safe. Mother said that her sister-in-law would help her with the children. Mother testified that if

[11]Mother's visits occurred every other Friday.

the children were returned, she would live on 24th Street in the house with J. and his three children. Mother asked the trial court to allow her children to come live with her even though she did not have enough places for all of them to sleep at the two-bedroom house on 24th Street.

## J. Recommendations

Cuevas stated that she could not tell from interactions with Mother or her service providers whether Mother had made any lifestyle changes. Cuevas testified that terminating Mother's parental rights was in the children's best interest. Cuevas asked that the Department be named the permanent managing conservator with the right to place the children up for adoption.

The Court-Appointed Special Advocate's report stated that Mother had not demonstrated enough progress to reduce the risks associated with Mother's drug history, the extensive concerns regarding her instability, and her inadequate care of the children. CASA recommended that the trial court terminate Mother's parental rights to all five children.

The children's ad litem, James Masek, testified that the trial court should follow the Department's recommendation because he had not seen a change in Mother's lifestyle and because the children were now thriving in foster care.

## K. Trial Court's Disposition

After hearing the above testimony and reviewing the evidence, the trial court found by clear and convincing evidence that Mother had violated Texas Family Code section 161.001(1)(D), (E), (N), (O), and (P) and that termination of

11

Mother's parental rights to E.S.D.L.S., A.A.D.L.S., P.H.D.L.S., S.D.L.S., and Y.S. is in the children's best interest. This appeal followed.

### III. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE SUPPORTS BEST INTEREST FINDING

In her sole issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best interest finding. Specifically, Mother argues that insufficient evidence was introduced at trial indicating that Mother would not be able to adequately provide for the emotional, physical, mental, or spiritual needs of the children now or in the future; Mother contends that the evidence at trial—that she had accessed State of Texas benefits for the children and had fed them—is sufficient to conclusively demonstrate that she has the ability to care for and parent her five children.

### A. Burden of Proof and Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 n.1 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe

involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)   any excuse for the acts or omissions of the parent.

15

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).[12]

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### B. Analysis of Evidence Under the *Holley* Factors

Mother focuses her combined legal and factual sufficiency argument on two of the *Holley* factors: the children's emotional and physical needs now and in the future and the parental abilities of the person seeking custody. We will weigh each of the nine factors set forth above.

With regard to the desires of the children, the evidence revealed that E.S.D.L.S., the oldest child who had acted as the other children's caretaker while Mother had used drugs, had told the CASA volunteer that she did not want to return home. The CASA volunteer noted "[t]he children are sometimes affectionate with their mother, seem at ease during visits, and are glad to eat the food their mother usually brings," but "the children have not displayed any noticeable emotion when leaving the visits." Mother, however, told her counselor

---

[12]Because Mother's appellate brief references and utilizes only the *Holley* factors in her analysis, we focus on these factors rather than the statutory factors.

in August 2012 that S.D.L.S. and P.H.D.L.S. seemed sad and cried when she left after a visit and that they told her that they want to live with her. The trial court was entitled to find that this factor weighed in favor of termination of at least Mother's parental rights to E.S.D.L.S.

With regard to the emotional and physical needs of the children now and in the future, the children require basic needs: food; shelter; clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and recreational activities appropriate to their ages. Here, when the children came into care, they had untreated lice infestations that were difficult to remove, and S.D.L.S. was dirty and bruised; A.A.D.L.S. had not been enrolled in school, was developmentally delayed, and had speech difficulties; and E.S.D.L.S. had missed numerous days of school while she was in Mother's care. Mother also moved the children frequently as her housing situation fluctuated. Based on the physical neglect of the children by Mother and her housing instability, the trial court was entitled to find that this factor weighed in favor of termination.

With regard to the emotional and physical danger to the children now and in the future, four of the five children were age six or under and could not protect themselves. The notes from Mother's counseling session three months prior to the termination trial states, "Client does not appear to understand the importance of taking care of her and her children or protecting them from harm," and "[s]he has a long history of making poor judgments regarding decisions that affect her

17

children." The record demonstrates that Mother had lived with men who were abusive to both her and the children and that Mother was abusive to the children, locking them in the closet and scaring them with stories about monsters who would "get them" if they were not quiet while they were locked in the closet. Mother had used cocaine and had given birth to two children who were born with cocaine in their systems, yet Mother minimized her drug use. Moreover, the trial court could have reasonably concluded that Mother either used methamphetamine or exposed the children to someone who had used methamphetamine because S.D.L.S. tested positive for the substance when she was removed from Mother's care following Y.S.'s birth. Due to the prevalent physical abuse and drug abuse, the trial court was entitled to find that this factor weighed in favor of termination.

With regard to her parenting abilities, the evidence detailed above reveals that Mother did not provide for her children's physical and emotional needs and that she had not eliminated the physical and emotional dangers. The testimony at trial also demonstrated that Mother had not worked the bulk of her services, including finding employment and leasing a place to live that would accommodate her and her five children. Although Mother claimed to have changed a lot because she was thinking more about her children and behaving better with them, neither Cuevas, the children's ad litem, nor the CASA volunteer had seen Mother make progress in her parenting during the case. The trial court was entitled to find that this factor weighed in favor of termination.

18

With regard to the programs available to assist Mother and to promote the best interest of the children, the record reveals that Mother's counselor provided her with information regarding community resources and strongly encouraged her to call and obtain information on them but that Mother "usually agrees to call resources but doesn't follow up due to language, financial[,] & transportation barriers." The record revealed that Mother had taken advantage of benefits from the State in the past in order to provide food for her children, but during the pendency of the case, she had not worked the services available to her to promote the best interest of the children. The trial court was entitled to find that this factor weighed in favor of termination.

Mother's plan for the five children was to move them into the two-bedroom house with her on 24th Street, in which five people were already living. The Department planned for the children to be adopted, and the children were in an adoption-motivated placement at the time of the termination trial. The trial court was entitled to find that this factor weighed in favor of termination.

The stability of the home that Mother had proposed for the children was in flux, as she noted that J. could kick her out at any time. The record did not reveal any instability in the home that the Department had proposed for the children. The trial court was entitled to find that this factor weighed in favor of termination.

With regard to the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, the analysis set forth

19

above—which details Mother's drug use; her failure to meet her children's physical and emotional needs; her failure to address the physical and emotional dangers to the children, including abuse and locking them in the closet; and her failure to take advantage of the services that were offered to improve her parenting skills—reveals that the existing parent-child relationship between Mother and each of the five children is not a proper relationship. The trial court was entitled to find that this factor weighed in favor of termination.

With regard to any excuse for Mother's acts or omissions, Mother's counselor noted that Mother had struggled financially and had struggled due to the language barrier, that she lacked skills and a motivation to gain skills, and that she lacked follow-up on recommendations. Mother repeatedly failed to acknowledge her drug problem, even after going through FBSS services when S.D.L.S. was born with cocaine in her system. At the time of the termination trial, Mother had recognized that her drug use had hurt her children and testified that she regretted using cocaine. The trial court was entitled to find that this factor weighed neither in favor of nor against termination.

After weighing the evidence as it relates to the *Holley* factors, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights to her five children is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's finding

20

that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *In re M.R.*, 243 S.W.3d 807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding evidence factually sufficient to support best-interest finding because parents exposed children to domestic violence and drug abuse, mother had failed to obtain housing and employment, and children flourished in foster care); *In re J.L.C.*, 194 S.W.3d 667, 675–77 (Tex. App.—Fort Worth 2006, no pet.) (holding evidence factually sufficient to support best-interest finding because although mother had attended parenting classes and was attempting to overcome her drug addiction, mother had difficulty putting her child's needs ahead of her own; had exposed child to drugs when pregnant and continued to use after child was removed; was involved in a life of crime, unemployment, homelessness, and addiction; and could not provide a stable home). We therefore overrule Mother's sole issue.

## IV. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment terminating her parental rights to E.S.D.L.S., A.A.D.L.S., P.H.D.L.S., S.D.L.S., and Y.S.

SUE WALKER
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DELIVERED: May 30, 2013

21